### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOSHUA LEE and PIERRE MONTMEAS, *on behalf of themselves and all others similarly situated,* <br><br> Plaintiffs, <br><br> v. <br><br> BEN PASTERNAK; B24, INC.; BELIEVE FOUNDATION; and DOES 1 THROUGH 10, <br><br> Defendants. | **Case No.: 1:26-cv-2368** <br><br> **COMPLAINT FOR DAMAGES** <br><br> **JURY TRIAL DEMANDED** |

**TABLE OF CONTENTS**

I. PRELIMINARY STATEMENT..................................................................................................3

II. PARTIES..............................................................................................................................5

III. JURISDICTION AND VENUE..............................................................................................7

IV. FACTUAL ALLEGATIONS...................................................................................................9

V. CLASS ALLEGATIONS....................................................................................................27

CLAIMS FOR RELIEF..........................................................................................................30

PRAYER FOR RELIEF..........................................................................................................39

JURY DEMAND....................................................................................................................41

## I.   PRELIMINARY STATEMENT[1]

1. Defendant Ben Pasternak is a venture-backed serial entrepreneur who raised over fifty million dollars from institutional investors and sold a company at a quarter-billion-dollar valuation. He launched a cryptocurrency token and sold it to consumers the way a company sells stock. He promised early supporters would be rewarded for getting in first. He promised that platform revenue would fund buybacks to support the token's value. He promised the token's supply would be managed to protect existing holders.

2. Then he broke every one of those promises. He diluted consumers' holdings by printing new tokens for insiders. He destroyed the holdings of consumers who failed to meet arbitrary deadlines. And then Pasternak disappeared and every commitment he made went with him. Consumers lost nearly everything. This action is brought on behalf of those consumers.

3. Pasternak launched his token in January 2025 on a platform he built called Clout, later renamed Believe. On the day the token launched, Pasternak told consumers he had '0 ownership' in it. That representation built trust: consumers believed they were backing a founder who had deliberately foregone the potential for insider enrichment that plagued other token projects.

4. For five months, while the token's price fell, Pasternak publicly promised a buyback program that would use platform fees to support the token's price.

5. He and his team also ran a coordinated campaign urging consumers to hold through the decline: "Short term price action is irrelevant. Trust the process." "Traders hold coins for

---

[1] *Unless otherwise indicated, the allegations in this Complaint are based on Plaintiff's personal knowledge as to Plaintiff's own acts and experiences and, as to all other matters, on information and belief. Plaintiff's information and belief is based on the investigation of counsel, including review and analysis of publicly available information (including Defendants' statements, websites, written materials, interviews, podcasts, and social-media communications), press reporting, and, where relevant, on-chain blockchain records and transaction data, as well as other information obtained through counsel's investigation.*

48H. True believers hold coins for months and years." "Patience is bitter but its fruit is sweet." "Stop Trading. Believe in something." Consumers who might otherwise have sold held on, waiting for the promised return that was always just around the corner.

6. Then, on October 15, instead of delivering the buyback, Pasternak announced a forced migration to a new token and told consumers the promised-buyback would only go live at the end of the migration window. Pasternak told consumers that "no individual or entity is getting coins for the next year at minimum." In reality, the foundation's allocation, approximately forty million tokens, was immediately unlocked.

7. The migration created 333 million new tokens and gave them to insiders, diluting every existing holder's stake by a third. Consumers who did not complete the migration lost everything: their tokens were permanently destroyed.

8. The supposed buyback program that consumers had waited five months for finally launched on October 29, 2025; not as the relief consumers had been promised, but as a footnote to the dilution they had just been forced to accept.

9. Then Pasternak disappeared. After months of assuring consumers he was building, he went silent. He gave no updates, no explanations, and no response to the consumers who had trusted his promises. He briefly resurfaced months later to announce he was building something else entirely.

10. As of the date of this filing, Pasternak has not made an original post on X since October 29, 2025. The official @believeapp account has not posted since January 13, 2026.

11. Pasternak ran the same play three times, under three different token names: generate excitement, bring consumers in, collect fees, and let the token collapse.

12. Each time, he and his entities profited on every transaction, including the sell-offs that wiped out consumers. In total, Defendants extracted fees estimated in the tens of millions of dollars and hundreds of millions in market cap were erased.

13. Plaintiffs bring this action individually and on behalf of a class of all persons who purchased, acquired, or held $PASTERNAK, $LAUNCHCOIN, or $BELIEVE tokens and suffered losses as a result of Defendants' deceptive, misleading, and unconscionable conduct, asserting claims under the New York General Business Law §§ 349 and 350, the California Unfair Competition Law and False Advertising Law, and common-law claims for negligent misrepresentation and unjust enrichment.

## II. PARTIES

### a. Plaintiffs

14. Joshua Lee, an individual and citizen of the State of California, residing in Playa Vista, California, brings this action individually, as representative of the Class defined herein, and as representative of the California Consumer Subclass defined herein. Lee purchased $LAUNCHCOIN tokens and suffered losses of several thousand dollars. Lee was exposed to Defendants' public representations regarding the $BELIEVE token which were disseminated broadly through X and other public channels, and purchased or held tokens in reliance on those representations.

15. Pierre Montmeas, an individual and citizen of France, residing in Orléans, France, brings this action individually and as representative of the Class defined herein. Montmeas purchased $LAUNCHCOIN and suffered losses of several thousand dollars. Montmeas was exposed to Defendants' public representations regarding the $BELIEVE token which

were disseminated broadly through X and other public channels, and purchased or held tokens in reliance on those representations.

### b. Defendant Ben Pasternak

16. Defendant Ben Pasternak ("Pasternak") is an individual residing in Manhattan, New York, New York. Pasternak is the founder and chief executive officer of the Believe platform (formerly known as Clout) and CEO of the Entity Defendants defined below. Born on September 6, 1999, in Sydney, Australia, Pasternak is an Australian citizen who relocated to New York City at the age of fifteen. He is currently twenty-six years old.

### c. Defendant B24, Inc.

17. Defendant B24, Inc. ("B24") is a corporation with a business address at 169 Madison Avenue, Unit 11628, New York, New York 10016. B24 is the operating entity that developed and maintained the Believe platform and is identified as the developer of the "Believe" iOS application in the Apple App Store.

### d. Defendant Believe Foundation

18. Defendant Believe Foundation (the "Foundation") is an entity that serves as the contracting party under the platform's published Terms of Use at believe.app/terms and holds the copyright to the Believe iOS application. The Foundation controls the $BELIEVE token treasury and flywheel buyback wallet.

### e. Doe Defendants

19. Defendants John Does 1 through 10 are unknown individuals and/or entities who participated in, aided, abetted, or conspired with the named Defendants in the conduct described herein. Their true names and identities are currently unknown to Plaintiffs and

will be ascertained through discovery. Plaintiffs reserve the right to amend this Complaint to include the true names and identities of these Defendants when ascertained.

20. B24, Believe Foundation, and their affiliates are referred to collectively as the "Entity Defendants." The Entity Defendants and Pasternak are referred to collectively as "Defendants."

## III.  JURISDICTION AND VENUE

### a.  Subject Matter Jurisdiction

21. This Court has original jurisdiction over this action pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. §1332(d)(2), because: (a) this is a class action in which the matter in controversy exceeds the sum of $5,000,000, exclusive of interest and costs; (b) the proposed Class contains more than 100 members; (c) at least one member of the proposed Class is a citizen of a State different from at least one Defendant; and (d) at least one member of the proposed Class is a citizen or subject of a foreign state.

22. The aggregate amount in controversy substantially exceeds $5,000,000. The Believe platform processed over six billion dollars in cumulative trading volume, extracted tens of millions of dollars in platform fees alone, and exposed more than hundreds of thousands of consumers to losses estimated in the hundreds of millions of dollars.

23. Individual Class members suffered losses ranging from hundreds to hundreds of thousands of dollars.

### b.  Personal Jurisdiction — Ben Pasternak

24. This Court has personal jurisdiction over Defendant Pasternak because Pasternak is domiciled in Manhattan, New York, New York, within this District. See Fed. R. Civ. P. 4(k)(1)(A) (incorporating New York's general jurisdiction statute, CPLR §301).

7

25. This Court also has specific personal jurisdiction over Defendant Pasternak because Pasternak directed the consumer-facing Believe platform and made the key public communications at issue from New York to consumers throughout the United States. See Fed. R. Civ. P. 4(k)(1)(A) (incorporating CPLR §302(a)(1)).

### c.  Personal Jurisdiction — B24, Inc.

26. This Court has personal jurisdiction over Defendant B24, Inc. because B24 identifies a business address in Manhattan and transacts business throughout the United States, including by operating the Believe/Clout website and distributing the Believe/Clout mobile application through U.S. app stores. B24 transacts business in New York through its operation of the Believe platform. Pasternak, B24's founder and controlling principal, operates B24 from New York. See Fed. R. Civ. P. 4(k)(1)(A) (incorporating CPLR §302(a)(1)).

27. The Believe platform was accessible to consumers throughout the United States via the Apple App Store, web browser, and direct credit card purchases, and was actively promoted to consumers nationwide through social media.

### d.  Personal Jurisdiction — Believe Foundation

28. This Court has personal jurisdiction over Defendant Believe Foundation because the Foundation is controlled by Pasternak and B24 from New York. Under agency and alter ego theories, the Foundation's contacts with New York are attributable through its controlling persons and entities. See Fed. R. Civ. P. 4(k)(1)(A).

29. The flywheel wallet activity and token treasury management directed by the Foundation were conducted from New York under the supervision and control of Pasternak and B24.

### e.  Venue

30. Venue is proper in this District pursuant to 28 U.S.C. §1391(b) because Defendants Pasternak and B24, Inc. reside in this District, and a substantial part of the events or omissions giving rise to the claims occurred in this District.

## IV.    FACTUAL ALLEGATIONS

### a.    The Project and Token

31. Ben Pasternak is a serial entrepreneur who built his career raising institutional capital and selling consumer technology companies.

32. Before founding the Believe platform, Pasternak founded or co-founded Impossible Rush (2014), Flogg (2016), the Monkey App, and Simulate, a plant-based food company that raised over fifty million dollars from institutional investors at a valuation exceeding two hundred fifty million dollars before being acquired in October 2024.

33. That track record gave consumers reason to trust that the Believe platform and its token would be managed with the same professionalism Pasternak had demonstrated in traditional business.

34. Pasternak reinforced that trust by marketing the token the way a company markets stock to the public. He told consumers to think like startup investors, compared Believe to Y Combinator, promised a buyback mechanism in which platform fees would be used to purchase tokens on the open market, and invited consumers to hold for years the way early-stage investors do.

35. Consumers bought the token for the same reason people buy stock: they expected the price to rise because the platform was performing well and professional management would create value they would share in.

9

36. The technical details that follow show how Pasternak operated the token using structures drawn from traditional corporate finance:

   a. Pasternak launched the token through a mechanism that functioned like seed-stage investing, rewarding early participants with favorable pricing that increased as demand grew.

   b. Pasternak built a revenue ecosystem around the token, distributing platform income to creators, early supporters, and the token itself through buybacks.

   c. Pasternak promoted a buyback program in which platform fees would be used to purchase tokens on the open market, the same technique public companies use to support their share price.

   d. Pasternak managed the token's supply by permanently destroying tokens held by consumers who failed to act within arbitrary deadlines.

   e. Pasternak executed a series of corporate-style restructurings that altered the token's terms and diluted existing holders, comparable to the kind of corporate action that impacts shareholders' voting rights and economic interests.

37. In January 2025, Pasternak founded the Clout platform, a Solana-based cryptocurrency token launchpad accessible at clout.me. Clout was marketed as a consumer-facing mobile product distributed through U.S. app stores. In January 2025, Pasternak posted screenshots showing Clout in the iOS App Store "Top Charts" for Finance apps. Clout was identified as developed by "B24 Inc." Throughout the relevant period, Pasternak served as the Founder and Chief Executive Officer of the platform and its operations.

38. On or about January 8, 2025, Pasternak posted on X: "Buy me on Clout App," accompanied by a screenshot displaying the text: "Let others get in at an early price before your price is determined by the general public."

39. On January 24, 2025, Pasternak launched a token called $PASTERNAK. He told consumers it was a fair launch with no insider allocation: he had "0 ownership in the token." That claim was itself a signal of insider manipulation: Pasternak was telling consumers he had structured the launch to prevent the very kind of insider enrichment he would later execute.

40. The token surged to eighty million dollars in market capitalization within a single day. Consumers purchased the token for the same reason retail investors purchase shares in a public offering: they expected the price to rise as the platform succeeded.

41. Within approximately one week, the token had lost over ninety-five percent of its value. By March 2025, it had collapsed to approximately $190,000 in market capitalization, representing a 99.7% decline from its peak.

42. Pasternak later characterized the collapse as a 'public experiment,' conceded the product 'has a lot of flaws,' and asked consumers for their 'patience,' offering nothing to those who had already lost real money.

43. On or about April 28, 2025, Pasternak rebranded Clout to Believe. On or about May 2, 2025, the $PASTERNAK token was renamed $LAUNCHCOIN.

44. Between May 12 and May 15, 2025, the $LAUNCHCOIN token surged to over two hundred forty million dollars in market capitalization. The token reached an all-time high price of $0.3647 on May 15, 2025.

45. In the first week following the rebrand, tens of thousands of tokens were launched on the Believe platform, with total ecosystem market capitalization topping four hundred million dollars.

46. Between May 2025 and October 2025, the $LAUNCHCOIN token's price declined from its all-time high toward zero while Defendants made at least twelve separate public promises about a "flywheel" buyback mechanism under which platform fee revenue would be used to purchase tokens on the open market. Consumers understood this promise the same way shareholders understand a dividend or stock buyback: platform revenue would flow back to support the value of their holdings.

47. On or about October 15, 2025, Pasternak announced a forced migration from $LAUNCHCOIN to a new token designated $BELIEVE. The migration increased total token supply by 33.3% (from one billion to 1,333,333,284 tokens), in effect allocating the entirety of the new tokens to insiders while existing holders received none.

48. Existing $LAUNCHCOIN holders received no additional tokens to offset their proportional dilution, and those who did not complete the migration lost their entire investment.

49. On October 29, 2025, the same day the forced migration was to end and $LAUNCHCOIN would be wound down, Pasternak finally launched the promised flywheel. The timing created maximum pressure on holders to participate in the migration while offering the long-promised flywheel as the inducement.

50. After October 2025, Pasternak and the official @believeapp account went largely silent. For a gap of more than two months, there were no substantive updates, no transparency

reports, and no meaningful engagement with the community that had entrusted tens of millions of dollars to their representations.

51. In January 2026, Pasternak resurfaced to announce Believe v2, a 'sentiment markets' product featuring perpetual two-sided "Believe" and "Doubt" positions. Believe v2 was an entirely different product that represented the third fundamental restructuring of the project in less than twelve months. As of the date of this filing, Pasternak has not made an original post on X since October 29, 2025. The official @believeapp account has not posted since January 13, 2026.

52. Throughout the relevant period, Pasternak exercised control over all material business decisions affecting the Believe platform, its token ecosystem, and the interests of consumers. These decisions included the rebranding from Clout to Believe, the renaming of $PASTERNAK to $LAUNCHCOIN, the forced migration to $BELIEVE, the 33% expansion of token supply, the introduction of insider allocations, the timing and terms of the flywheel buyback mechanism, the fee structure and its modifications, and the allocation of platform revenue.

53. None of these decisions were submitted to token holders for approval or conducted through any formal governance mechanism.

54. Throughout the relevant period, Defendants collected a platform fee on every transaction on the Believe platform, initially 1% and later approximately 0.6% of each transaction, which processed at least approximately six billion dollars in cumulative trading volume. Total platform fee revenue is estimated at approximately fifty-four million dollars. Like the management fees charged by a fund manager, these fees were extracted from every consumer transaction as compensation for operating the platform, but without the

fiduciary duties or disclosure requirements that accompany such fees in traditional finance.

55. In addition, Pasternak personally earned a creator fee on trades in his tokens, as described below. The Foundation, B24, Inc., and Pasternak operated as coordinated entities managing the token ecosystem, constituting a joint venture for the purposes of the conduct alleged herein.

### b. The Believe Platform and Token Architecture

#### i. Platform Description

56. The Believe platform, formerly known as Clout, is a Solana-based cryptocurrency token launchpad that enables users to create new tokens through a simplified interface. The platform was accessible through a web interface at believe.app, an iOS mobile application listed in the Apple App Store under the Finance category, and through automated replies on X (formerly Twitter) by tagging the @launchcoin account with a desired token name.

57. The platform was designed to eliminate all technical barriers to token creation and trading. Users did not need a cryptocurrency wallet, technical knowledge, or coding ability to launch a token. The platform accepted credit card payments, enabling any consumer (including those with no prior experience in cryptocurrency) to participate in token creation and trading with a single click. The platform did not require know-your-customer verification or investor accreditation of any kind.

58. B24 is the operating entity that developed, maintained, and controlled the Clout and Believe platforms. In that capacity, B24 developed and deployed the platform's smart contracts (self-executing programs that automatically governed the token's economic

14

rules, comparable to the charter documents of a corporation) on the Solana blockchain, maintained the web interface and mobile application through which consumers created and traded tokens, collected and distributed transaction fees generated by all trading activity on the platform, and made business decisions regarding token migrations, fee structures, and platform features.

### ii.    Bonding Curve and DEX Graduation

59. Tokens created on the Believe platform launched at a low initial price and traded on a built-in pricing curve that automatically increased the price as more buyers entered, rewarding early participants with lower prices in much the same way that early investors in a traditional offering receive favorable pricing before the public. When a token's market capitalization reached one hundred thousand dollars, it "graduated" to the Meteora exchange, the third-party trading venue on the Solana blockchain that served as the secondary market for Believe tokens, where it then could be traded.

60. In practice, the vast majority of tokens launched on the Believe platform failed to reach the one-hundred-thousand-dollar graduation threshold and lost most or all of their value.

### iii.    Fee Distribution

61. The Believe platform charged a transaction fee of approximately 2% on all trades. This fee was initially split equally between the token creator and the Believe platform. In or about June 2025, the fee split was modified to 70% for the creator and 30% for the platform on newly launched tokens.

62. In addition to the creator and platform fees, the Believe platform introduced a "scout" system under which the first person to "coin" a project (that is, to trigger a launch by tagging an X post) earned 0.1% of all subsequent transaction fees generated by that

token. This scout system operated as a finder's fee arrangement, creating a formalized financial incentive for third parties to amplify the reach of token launches on the platform.

### iv.    Token History and Contract Details

63. The original $PASTERNAK token was launched in January 2025 with a total supply of one billion tokens. The token was deployed on the Solana blockchain at contract address Ey59PH7Z4BFU4HjyKnyMdWt5GGN76KazTAwQihoUXRnk.

64. On or about May 2, 2025, Pasternak modified the on-chain metadata of the existing $PASTERNAK token contract to rename it $LAUNCHCOIN. No new token contract was deployed; the existing contract was reused with a new name, comparable to a corporate name change that does not alter the underlying entity or its shareholders' rights.

65. On or about October 15, 2025, the team announced a migration from $LAUNCHCOIN to a new token designated $BELIEVE, deployed at Solana contract address BLVxek8YMXUQhcKmMvrFTrzh5FXg8ec88Crp6otEaCM.

66. The migration increased the total token supply from one billion to 1,333,333,284, a 33.3% increase, diluting existing holders and allocating the additional tokens to insiders. Unlike the earlier name change, this migration required every holder to exchange their tokens for new ones or lose them entirely, comparable to a mandatory share exchange in a corporate restructuring.

### c.   Marketing and Public Representations

### i.    Vision and Mission Representations

67. From mid-2025 onward, Pasternak and the official Believe accounts represented the platform as enabling "Internet Capital Markets," a decentralized framework through

which anyone with an idea could raise community funding by issuing tokens. The platform was positioned as an alternative to traditional venture capital and crowdfunding, and its stated mission was to democratize access to capital formation by enabling creators, influencers, and entrepreneurs to launch tokens representing their projects without requiring technical expertise or traditional fundraising infrastructure.

68. On or about May 12, 2025, the official @believeapp account posted that the platform was "going to disrupt traditional venture capital and revolutionize how founders raise funding" and described Believe as building "the YC of the decentralized era." On or about May 14, 2025, the same account posted: "Web2 gave you vibe coding. Web3 gives you vibe raising."

69. On or about April 28, 2025, the official Believe account announced the rebrand from Clout with the messaging: 'Clout → Believe' and 'Believe in someone → Believe in something,' instructing users to "Reply to any tweet with @launchacoin +name to turn it into a coin." This announcement has since been taken down.

### ii.     The "0 Ownership" Misrepresentation

70. On or about January 24, 2025, the same day the $PASTERNAK token was launched, Pasternak posted on X: "Please note: I have 0 ownership in the token." Months later, on or about October 15, 2025, Pasternak reiterated this framing, stating that when he launched the original token in January he "had never even purchased a Solana coin before" and that his "belief at the time was that creators should only profit from trading fees rather than selling their own coin."

71. On or about October 15, 2025, the day the $LAUNCHCOIN to $BELIEVE migration was announced, Pasternak stated that "no individual or entity is getting coins for the next

17

year at minimum." That statement was materially misleading: the migration simultaneously allocated 3% of the new token supply (approximately forty million tokens) to a project foundation controlled by the Believe team, immediately unlocked with no vesting restriction.

72. In the same thread, Pasternak stated that the "Team received zero at launch" and that "the coin initially launched as $PASTERNAK, Believe did not exist at the time." These statements framed the October 2025 migration as continuous with a January 2025 launch in which no insider allocations existed, while omitting that the migration introduced such allocations for the first time.

### iii.    The Deceptive Omission of Economic Self-Interest

73. Pasternak's January 24, 2025 "0 ownership" representation established a public expectation that the token economy would remain free of insider allocations. That representation was not a one-time statement: Pasternak maintained the disinterested-founder narrative for months, and consumers who purchased or held the token during that period did so against the backdrop of a founder who had publicly disclaimed any personal stake in the token's supply. The "0 ownership" framing was central to the trust Pasternak cultivated and to the consumer confidence that sustained the token's market.

74. On October 15, 2025, Pasternak exploited that trust.

75. Within hours, Pasternak posted a series of statements specifying that investor lockup timers would start from the date of their investment, that "the earliest investor unlock will occur a year from today," and that "the earliest contributor unlocks start a year from today."

18

76. Pasternak stated that the foundation supply would "be exclusively used for ecosystem initiatives" and would "not be given to team or contributors." Conspicuously absent from this sequence was any lockup or vesting term for the foundation allocation itself.

77. A Believe team member confirmed hours later that the foundation tokens were immediately unlocked.

78. These statements were technically accurate with respect to the January 2025 launch and the contributor and investor lockups, but materially misleading in context: the foundation allocation described above was immediately available without any lockup or vesting restriction.

79. Pasternak's economic self-interest in the platform was not limited to the October 2025 allocations. Throughout the relevant period, Pasternak was the creator of the $PASTERNAK, $LAUNCHCOIN, and $BELIEVE tokens and thus the recipient of a creator fee on every transaction in those tokens. That fee was initially approximately 1% under the original equal fee split, and rose to approximately 1.4% after the fee structure was modified to the 70/30 split in or about June 2025.

80. On June 21, 2025, Pasternak himself acknowledged this interest, posting on X: "I also have one of the strongest financial incentives imaginable to take it to infinity and beyond."

81. By September 30, 2025, Pasternak stated that "the Believe ecosystem has quietly processed close to $6B in trading volume." At a creator fee of approximately 1.4% applied to every transaction, this volume generated substantial fee revenue for token creators across the platform. That revenue included fees paid to Pasternak, who as creator

of $PASTERNAK, $LAUNCHCOIN, and $BELIEVE was entitled to creator fees on all trading volume in those tokens.

82. The precise amount of Pasternak's fee income is known to Defendants and will be established through discovery.

### d. Promotional Activity and Consumer Solicitation

#### i. Primary Promotional Channels

83. The Apple App Store listing for Believe represented that users could "potentially win when they win," reinforcing Defendants' broader public messaging that consumers would benefit economically from the success of projects launched on the platform. Defendants promoted the platform and its tokens through X, the Believe website, and the App Store listing, reaching consumers nationwide without geographic restriction.

84. In addition to Pasternak, the Believe platform team included an individual using the handle @stigstigstig_, who joined the team in or about late August 2025 and subsequently made public statements on X regarding the platform's operational failures, as described below.

#### ii. Key Opinion Leader and Ecosystem Relationships

85. The Believe project also maintained relationships with prominent figures and entities in the Solana cryptocurrency ecosystem.

86. Pasternak acknowledged the significance of the Meteora exchange, stating in or about October 2025: "Believe would not exist without their product and support."

87. Meteora provided the infrastructure upon which graduated Believe tokens traded, and its founder retweeted Believe announcements, providing ecosystem endorsement.

88. Imran Khan, identified as a leader of AllianceDAO, was an early supporter of the Clout platform and launched the second token on Clout. Key Solana figures promoted Clout as well.

### iii.    The Scout System

89. The Believe platform's "scout" system, described above, created a formalized financial incentive for third-party promotion, effectively deputizing a network of promoters who were compensated based on the trading volume they helped generate.

### iv.    Promotional Reach

90. Pasternak's prior entrepreneurial credibility and the platform's formalized incentive structures combined to produce rapid consumer adoption at scale. The defendants' promotional activity was not geographically restricted: the platform was accessible to consumers in New York and throughout the United States via the App Store, the web interface, and X.

### e.  The October 2025 Migration, Insider Allocations, and Fee Extraction

### i.    Migration Announcement and Terms

91. On or about October 15, 2025, the official Believe accounts announced that the $LAUNCHCOIN to $BELIEVE 'upgrade' was live.

92. Existing $LAUNCHCOIN holders were required to convert their tokens to $BELIEVE on a one-to-one basis through the Believe website during a migration window that would remain open until October 29, 2025, a period of approximately two weeks. This marked the second time in less than six months that Pasternak had fundamentally altered the terms of consumers' token holdings.

93. The migration included an increase in total token supply from one billion to 1,333,333,284, a 33.3% increase. The team publicly described this supply change as a "25% increase" in its official communications. The actual increase was 33%. Independent reporting subsequently characterized this discrepancy as a math error.

### ii. Introduction of Insider Allocations

94. The additional 333,333,284 tokens created through the supply expansion were allocated to insiders: approximately 17% of total supply was allocated to current and future contributors, subject to four-year vesting with a one-year initial lock (terms that parallel the lock-up periods restricting insider sales after a traditional public offering); approximately 5% to early investors, locked for one year; and approximately 3% to foundation initiatives, immediately unlocked with no vesting restriction, representing approximately forty million tokens available to insiders without restriction.

95. Despite the foundation's stated commitment to use the allocation exclusively for "ecosystem initiatives," no structural mechanism prevented direct token sales.

96. Existing $LAUNCHCOIN holders received no additional tokens to offset the dilution of their percentage ownership resulting from the supply increase. The practical effect was that each existing holder's proportional ownership of the token supply was reduced while newly created tokens were allocated to insiders whose identities were not disclosed to the public. Consumers who had purchased the token on the strength of Pasternak's '0 ownership' representation and his track record of professional financial management had no reason to expect that insiders would receive newly created tokens at their expense.

97. Independent crypto reporting characterized this shift as an about-face, from 'we won't sell our own coin' to effectively reserving tokens and propping up its value, noting that by

allocating tokens to team and investors (with lockups and vesting), Believe shifted towards a more traditional crypto project structure, effectively acknowledging $BELIEVE as the token underpinning the platform's ownership and incentive system.

### iii. The Burn Mechanism

98. The team stated that tokens not migrated by the October 29, 2025 deadline would be permanently burned and rendered worthless. This meant that holders who were unaware of the migration, unable to access the platform, or otherwise failed to act within the approximately two-week window would permanently lose their entire investment.

99. On or about October 29, 2025, the official Believe account stated that the upgrade period was ending, that over 85% of holders had made the switch, and that $LAUNCHCOIN had been "wound down."

100. The platform's own materials characterized the burn mechanism as a feature rather than a harm. The official @believeapp account announced that "any unclaimed tokens will be permanently burned, with the aim of reducing the total supply toward 1 billion," framing the destruction of non-migrating holders' tokens as a supply-reduction benefit for those who remained. In traditional finance, a company reduces its outstanding shares by buying them back on the open market from willing sellers. Here, the supply reduction was achieved by permanently destroying the holdings of consumers who failed to act within a two-week window.

### iv. Pre-Migration Wallet Activity

101. On-chain data analyzed by multiple cryptocurrency news sources showed heavy token dumps by top wallet addresses in the period preceding the October 2025 migration

snapshot. The identities of these wallets and their relationship to insiders have not been confirmed and require further on-chain analysis and discovery.

### v.    Market Reaction and Community Backlash

102.    The market reacted immediately and negatively to the migration announcement. $LAUNCHCOIN's market price plunged approximately 30% almost immediately following the announcement on or about October 15, 2025.

103.    The community reaction was described as "largely negative and accusatory." Many holders felt blindsided by the dilution. The discrepancy between the announced "25% increase" and the actual 33% increase was widely mocked on X, with one prominent crypto figure noting that "100 * 1.25 is 133." Other community members accused the team of effectively performing a "rugpull," with one stating: "rugging your ecosystem after 6 months of silence is incredible ... whole team needs to go to jail."

104.    Independent reporting acknowledged that the incident "underscored how quickly trust can erode through opaque tokenomic changes," and noted that it marked the third time the founder had relaunched or rebranded the core token underpinning his project.

### f.    Consumer Harm, Loss Causation, and Damages

### i.    Operational Failures

105.    The Believe platform's low-friction, one-click token launch mechanism produced a proliferation of spam and scam tokens that flooded the platform and created a chaotic trading environment for consumers.

106.    On or about May 13, 2025, the platform experienced significant downtime due to high trading volume, leaving users unable to access or trade their tokens during a period of extreme price volatility.

107.    On or about May 22, 2025, the team introduced a manual vetting requirement for new token launches in response to the spam problem but reversed the measure within hours after community backlash, demonstrating that Defendants prioritized platform growth and fee revenue over consumer protection.

### ii.    Delivery Gap Analysis

108.    The gap between Defendants' representations and actual delivery was material in at least four respects.

109.    First, Pasternak's "0 ownership" representation established a reasonable consumer expectation that the token economy would remain free of insider allocations, yet the October 2025 migration introduced insider allocations totaling approximately twenty-five percent of the expanded token supply while Pasternak invoked the January 2025 launch history to minimize the significance of the reversal.

110.    Second, the flywheel mechanism was delayed more than five months while the token declined over 99%, rendering the promised value-accrual mechanism inoperative during the period of greatest holder loss.

111.    Third, the supply expansion was represented as twenty-five percent when the actual mathematical increase was thirty-three percent.

112.    Fourth, the forced migration was represented as preserving holder value while in fact destroying the holdings of non-migrating holders.

### iii.    Loss Causation

113.    Each significant price decline corresponded to a specific corrective event tied to Defendants' deceptive conduct, not general cryptocurrency market volatility.

114. The $PASTERNAK token collapsed within weeks of its January 2025 launch after the initial promotional hype subsided. The $LAUNCHCOIN token's 99.98% decline occurred over the period during which Defendants repeatedly promised but failed to deliver the buyback mechanism.

115. The October 2025 migration announcement triggered an immediate thirty percent price drop as the market absorbed the true extent of insider allocations and supply dilution. These corrective events, each tied to the revelation or realization that Defendants' representations were false or misleading, are the proximate cause of Plaintiffs' and Class members' losses, distinguishing this case from ordinary memecoin price volatility.

### iv. Damages

116. The pattern of harm across three serial iterations, $PASTERNAK, $LAUNCHCOIN, and $BELIEVE, was consistent and compounding. Each iteration followed the same cycle: hype and promotional activity, rapid price appreciation, and catastrophic decline. The $PASTERNAK token declined 99.5%. The $LAUNCHCOIN token declined 99.98%. The migration announcement caused an additional thirty percent plunge. Each relaunch exposed the same consumer base to repeated loss events, compounding the cumulative harm.

117. Actual damages to consumers are conservatively estimated at hundreds of millions of dollars. Under GBL §349(h), each Class member is entitled to recover actual damages or fifty dollars, whichever is greater, and the Court may in its discretion increase that award to an amount not to exceed three times actual damages, up to one thousand dollars, upon

a finding that Defendants willfully or knowingly violated the statute. Applied across hundreds of thousands of token holders, statutory damages alone are substantial.

118. Disgorgement of all unlawfully obtained profits is appropriate, including approximately fifty-four million dollars in platform revenue and all creator fees actually received by Defendant-controlled accounts, in amounts to be established through discovery.

119. The harm to consumers occurred through at least five distinct mechanisms: misleading representations inducing initial purchase; repeated promises of a flywheel buyback that kept consumers holding through a catastrophic price decline; a forced migration that destroyed the holdings of non-participating consumers; supply dilution that reduced every existing holder's proportionate ownership; and insider allocations that transferred newly created tokens to Defendants and their associates while offering nothing to the consumers whose holdings were diluted.

## V. CLASS ALLEGATIONS

### a. Class Definition

120. Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of the following Class:

121. All persons and entities who purchased, acquired, or held $PASTERNAK, $LAUNCHCOIN, and/or $BELIEVE tokens during the period from January 8, 2025 through the date of the filing of this Complaint (the "Class Period") and who suffered losses as a result of Defendants' conduct described herein (the "Class").

122. Excluded from the Class are:

a. Defendants and their officers, directors, agents, and employees;

b. members of the immediate families of any Defendant;

c. any entity in which any Defendant has a controlling interest;

d. persons who launched tokens as creators or scouts on the Believe platform and received creator fees;

e. institutional market-makers and liquidity providers;

f. persons who are bound by an enforceable arbitration agreement with Defendants covering the claims asserted herein and who do not opt out of such agreement; and,

g. the legal representatives, heirs, successors, and assigns of any excluded person.

123. California Subclass: All members of the Class who are citizens of the State of California or who purchased tokens while physically located in California.

**b. Numerosity (Rule 23(a)(1))**

124. The Class is so numerous that joinder of all members is impracticable. The $PASTERNAK, $LAUNCHCOIN, and $BELIEVE tokens were held by tens of thousands of individuals during the Class Period. The precise number of Class members can be ascertained through a combination of blockchain transaction data for the three known token contract addresses, which provides a verifiable, immutable ledger of all on-chain token purchases and sales, and Defendants' internal account and transaction records, which capture off-chain activity including credit card purchases, app-based transactions, and user account information.

**c. Commonality (Rule 23(a)(2))**

125. There are questions of law and fact common to the Class that predominate over any questions affecting only individual members, including but not limited to:

28

a. whether Defendants engaged in deceptive acts or practices in violation of GBL §349;

b. whether Defendants' public representations were materially misleading;

c. whether Pasternak's "0 ownership" representation was false or misleading;

d. whether the flywheel delay constituted a deceptive practice;

e. whether Defendants were unjustly enriched at the expense of Class members;

f. whether Defendants owed a duty of care to Plaintiffs and Class members to provide truthful and complete information in connection with the marketing and sale of the tokens;

g. whether Defendants failed to exercise reasonable care in ascertaining the accuracy of their public representations;

h. the proper measure of damages; and,

i. whether Plaintiffs and the Class are entitled to injunctive or equitable relief.

**d. Typicality (Rule 23(a)(3))**

126. Plaintiffs' claims are typical of the claims of the Class. Plaintiffs and all Class members purchased, acquired, or held the same tokens, were exposed to the same misleading representations disseminated through the same public channels, were subject to the same forced migration and supply dilution, and suffered the same types of injury, including overpayment, retention losses, dilution, destruction of unmigrated tokens, and fee extraction. Plaintiffs' claims arise from the same course of conduct that gives rise to the claims of the Class.

**e. Adequacy (Rule 23(a)(4))**

29

127.    Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs' interests are not antagonistic to or in conflict with the interests of the Class. Plaintiffs have retained counsel experienced in class action litigation and consumer fraud matters, who will vigorously prosecute this action on behalf of the Class.

### f.    Predominance and Superiority (Rule 23(b)(3))

128.    Common questions of law and fact predominate over any questions affecting only individual Class members. Defendants' representations were made uniformly to the entire market through public social media posts, platform disclosures, and on-chain mechanisms. The platform's fee structure, token mechanics, migration terms, and supply expansion affected all holders identically.

129.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy because:

a.   the large number of Class members makes individual joinder impracticable;

b.   individual damages for many Class members may be relatively small, making individual prosecution economically infeasible;

c.   this Court is an appropriate forum given that Defendants are located in this District; and,

d.   the claims involve common proof and can be managed efficiently as a class action.

### CLAIMS FOR RELIEF

**FIRST CLAIM FOR RELIEF**
**Deceptive Business Practices in Violation of GBL §349**
**(Against All Defendants)**

130.    Plaintiffs, individually and on behalf of the Class, repeat and re-allege each and every allegation set forth above as if fully set forth herein.

131.    Defendants' conduct was consumer-oriented. Defendants' conduct was directed at the consuming public through two reinforcing channels. First, Defendants promoted the tokens and the platform broadly through public social media posts on X, app store listings, and media appearances, reaching consumers nationwide without geographic restriction. Second, Defendants designed the platform to eliminate all traditional barriers to participation: the platform required no cryptocurrency wallet, no technical knowledge, and no investor accreditation, and accepted credit card payments, enabling any consumer to transact with a single click.

132.    Together, Defendants' public promotional campaign and barrier-free platform design ensured that the tokens and the representations at issue reached the broadest possible consumer audience. These deceptive practices affected all Class members uniformly, as Defendants' representations were made to the public at large through the same channels, reaching both consumers who transacted on the platform directly and those who purchased the tokens on secondary markets in reliance on Defendants' public statements.

133.    Defendants' deceptive conduct occurred in New York. B24, Inc. operates the Believe platform from its offices at 169 Madison Avenue in Manhattan. Every consumer transaction on the platform generated fees that flowed directly to B24 in New York.

134.    Pasternak directed all public representations, including the X posts, App Store listing, and platform communications at issue, from New York.

135.    The Apple App Store identifies B24, Inc. at its New York address as the seller and developer of the application.

136. The platform's operational control, fee processing, account management, and consumer-facing representations were all centered in and directed from New York. These facts establish that a substantial part of each transaction at issue occurred in New York within the meaning of GBL §§349 and 350.

137. GBL §349 prohibits deceptive acts or practices directed at consumers. Plaintiff pleads a deceptive scheme that included both affirmative misstatements and material omissions, organized below for clarity pursuant to Fed. R. Civ. P. 8(d)(2).

138. **Affirmative Misrepresentations:** Defendants made affirmative representations to consumers, including, but not limited to, the following.

a. Pasternak established a "0 ownership" narrative that created a reasonable consumer expectation of no insider allocations, maintained that narrative for months, and then introduced insider allocations totaling approximately twenty-five percent of the expanded token supply through the October 2025 migration.

b. Defendants represented the token supply expansion as twenty-five percent when the actual mathematical increase was thirty-three percent.

c. Defendants marketed the flywheel buyback as the primary value-accrual mechanism for token holders.

d. The Apple App Store listing described the platform as offering consumers the opportunity to "potentially win when they win," reinforcing the impression that consumers were acquiring tokens with genuine economic value tied to creator success.

e.  Each of these representations was materially misleading and likely to mislead a reasonable consumer.

139.  **Material Omissions.** Defendants omitted material information that a reasonable consumer would have considered significant in deciding whether to purchase or hold tokens. Defendants failed to disclose material information that a reasonable consumer would have considered significant in deciding whether to purchase or hold tokens, including, but not limited to, the following:

a.  the full extent of Pasternak's economic self-interest in the token, including creator fee revenue on every transaction, the insider allocations introduced through the October 2025 migration, and the Foundation's relationship to Pasternak;

b.  that the flywheel buyback mechanism had not been implemented and would not be operational for more than five months after launch;

c.  the unilateral power reserved by Defendants to force token migrations, alter supply, and modify the platform's economic structure without holder consent; and,

d.  the Terms of Service provisions purporting to waive all claims, disclaim fiduciary duties, and require Cayman Islands arbitration, provisions buried in documents not presented to consumers at the point of purchase.

140.  Plaintiffs and Class members suffered actual injury by reason of Defendants' deceptive scheme. Plaintiffs and Class members paid more for tokens than they otherwise would have paid, retained tokens they otherwise would have sold, lost proportionate ownership through the supply expansion, suffered total loss of unmigrated tokens through the burn mechanism, and paid fees on every transaction that were extracted by Defendants. Defendants' misleading statements and omissions distorted the economic

33

terms on which consumers transacted. Hundreds of millions of dollars in market value was erased. The $LAUNCHCOIN token declined 99.98% from its all-time high.

141.   No showing of scienter or individual reliance is required under GBL §349. Pursuant to GBL §349(h), Plaintiffs and each Class member are entitled to actual damages or fifty dollars per violation, whichever is greater, trebled up to one thousand dollars, plus reasonable attorney fees and costs.

142.   Defendants Pasternak, B24, Inc., and Believe Foundation are each liable for the deceptive practices described herein.

**SECOND CLAIM FOR RELIEF**
**False Advertising in Violation of GBL §350**
**(Against All Defendants)**

143.   Plaintiffs, individually and on behalf of the Class, repeat and re-alleges each and every allegation set forth above as if fully set forth herein.

144.   In the course of business, Defendants publicly disseminated advertising and promotional statements concerning the Believe platform and the $PASTERNAK, $LAUNCHCOIN, and $BELIEVE tokens through X posts, app-store marketing copy, the Believe website, and platform materials designed to induce consumer purchases and retention. Those advertisements were materially misleading for the reasons alleged in the First Cause of Action, including by representing that users could otherwise share in project success, by presenting Pasternak as having "0 ownership" without disclosing his fee-based economic interest, by describing the October 2025 supply expansion as 25% rather than approximately 33.3%, and by touting a buyback mechanism that was not then operational.

34

145. Plaintiffs and Class members were exposed to and deceived by these advertising statements and suffered injury as a result, including overpayment, retention losses, dilution, destruction of unmigrated tokens, and fee extraction.

146. Defendants are therefore liable under GBL §350 and §350-e.

147. Defendants Pasternak, B24, Inc., and Believe Foundation are each liable for the false advertising described herein.

**THIRD CLAIM FOR RELIEF**
**Violation of the California Unfair Competition Law**
**Cal. Bus. & Prof. Code § 17200 et seq.**
**(Against All Defendants, on Behalf of the California Consumer Subclass)**

148. Plaintiff Lee, individually and on behalf of the Class, repeat and re-alleges each and every allegation set forth above as if fully set forth herein.

149. California Business and Professions Code § 17200 prohibits any "unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising."

150. Unlawful Prong. Defendants' conduct was unlawful because it violated, inter alia, Cal. Bus. & Prof. Code § 17500 (the California False Advertising Law), as alleged herein.

151. Unfair Prong. Defendants' conduct was unfair because the harm it caused, including dilution through insider allocations, coerced migration under threat of permanent token destruction, fee extraction, and losses from deceptive marketing, substantially outweighs any legitimate utility of the conduct, and the harm was not reasonably avoidable by consumers given Defendants' centralized control over the token's economic terms.

152. Fraudulent Prong. The deceptive acts and practices described herein were likely to deceive reasonable consumers, and did deceive them.

35

153.   Lee has suffered injury in fact and has lost money or property as a result of Defendants' unfair competition, as required by Cal. Bus. & Prof. Code § 17204.

154.   Lee and the California Consumer Subclass are entitled to restitution and injunctive relief pursuant to Cal. Bus. & Prof. Code § 17203.

**FOURTH CLAIM FOR RELIEF**
**Violation of the California False Advertising Law**
**Cal. Bus. & Prof. Code § 17500 et seq.**
**(Against All Defendants, on Behalf of the California Consumer Subclass)**

155.   Plaintiff Lee individually and on behalf of the Class, repeats and re-alleges each and every allegation set forth above as if fully set forth herein.

156.   California Business and Professions Code § 17500 makes it unlawful for any person or entity to disseminate any statement "which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

157.   Defendants disseminated the untrue and misleading statements described herein through X posts from Pasternak's personal account and @believeapp, the Believe website, app store descriptions, and Defendants' web and mobile application.

158.   Defendants knew or, by the exercise of reasonable care, should have known that these statements were untrue or misleading. The supply-increase arithmetic is elementary. The characterization of a forced dilution as an "upgrade" and the omission of insider allocations were deliberate editorial choices, not inadvertent errors.

159.   Lee and the California Consumer Subclass are entitled to restitution and injunctive relief pursuant to Cal. Bus. & Prof. Code § 17535.

**FIFTH CLAIM FOR RELIEF**
**Negligent Misrepresentation**
**(Against All Defendants)**

36

160. Plaintiffs, individually and on behalf of the Class, repeat and re-alleges each and every allegation set forth above as if fully set forth herein.

161. Defendants owed a duty of care to Plaintiffs and Class members to provide truthful, accurate, and complete information in connection with the marketing, sale, and promotion of the $PASTERNAK, $LAUNCHCOIN, and $BELIEVE tokens. This duty arose because Defendants directly solicited consumer purchases through public channels, held themselves out as possessing superior knowledge of the platform's economics, token mechanics, fee structures, and development roadmap, and designed the platform to eliminate all traditional barriers to participation, including by accepting credit card payments and requiring no cryptocurrency wallet, KYC verification, or investor accreditation, thereby inviting reliance by consumers who had no independent means of evaluating Defendants' representations.

162. Defendants made the material misrepresentations and omissions described in the Factual Allegations above to Plaintiffs and Class members without reasonable grounds for believing them to be true.

163. Defendants failed to exercise reasonable care in ascertaining the accuracy of these representations. The supply-increase arithmetic was elementary: the difference between a 25% and 33% increase is a calculation any person could perform, yet Defendants published the lower figure to their entire consumer base. The flywheel promises were made without a reasonable basis for their stated timeline, as Defendants' own team member subsequently admitted the project had 'a token before product is fully matured.' And Pasternak stated that 'no individual or entity is getting coins for the next year at minimum' on the same day his team allocated approximately forty million immediately

37

unlocked tokens to the foundation he controlled, a fact he could not have failed to know when he made the statement.

164. Plaintiffs and Class members justifiably relied on Defendants' representations. The information necessary to evaluate their truth, including the terms of insider allocations, the status of flywheel development, fee flows to Defendant-controlled wallets, and the economic consequences of the forced migration, was peculiarly within Defendants' knowledge and not independently verifiable by consumers.

165. As a direct and proximate result of Defendants' negligent misrepresentations, Plaintiffs and Class members suffered damages, including purchasing tokens at inflated prices, retaining tokens in reliance on the promised flywheel, suffering dilution through the undisclosed supply expansion, destruction of unmigrated tokens, and extraction of fees on every transaction.

166. Defendants Pasternak, B24, Inc., and Believe Foundation are each liable for negligent misrepresentation.

**SIXTH CLAIM FOR RELIEF**
**Unjust Enrichment**
**(Against All Defendants, Pleaded in the Alternative)**

167. Plaintiffs, individually and on behalf of the Class, repeat and re-alleges each and every allegation set forth above as if fully set forth herein. This claim is pleaded in the alternative to the statutory claims above. To the extent Defendants contend that a valid and enforceable contract governs the parties' relationship, Plaintiffs assert this equitable claim in the alternative pursuant to Fed. R. Civ. P. 8(d)(2).

168. Defendants were enriched at the direct expense of Plaintiffs and Class members through identifiable, traceable fee flows. Trades executed through Believe-controlled

infrastructure generated platform fees routed to B24 and/or the Foundation, and trades in tokens created by Pasternak or other Defendant-controlled accounts generated creator fees for those accounts. Plaintiffs seek restitution only of funds or assets actually retained by Defendants and traceable through on-chain records and Defendants' books. It would be against equity and good conscience for Defendants to retain those traceable benefits.

169.    Plaintiffs' and Class members' tokens lost their value while Defendants continued to extract fees from every transaction on the platform. Defendants collected fees on both the buy side and sell side of every transaction, profiting from the very price declines and forced migrations that destroyed Class members' holdings. It would be against equity and good conscience for Defendants to retain these benefits, and Plaintiffs seek restitution of the fees and revenues Defendants extracted from Class members' transactions.

170.    Defendants Pasternak, B24, Inc., and Believe Foundation are each liable for unjust enrichment.

## PRAYER FOR RELIEF

171.    WHEREFORE, Plaintiffs, individually and on behalf of the Class, respectfully request that this Court enter judgment against Defendants, jointly and severally, and grant the following relief:

a.    An order certifying this action as a class action pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3), designating Plaintiffs as Class Representatives, and designating Plaintiffs' counsel as Class Counsel;

b.    An order directing that reasonable notice be given to Class members pursuant to Fed. R. Civ. P. 23(c)(2)(B);

c. An award of actual damages to Plaintiffs and the Class, including but not limited to out-of-pocket losses, the difference between the price paid and the actual value of the tokens at the time of purchase, overpayment damages, and consequential damages, in an amount to be proven at trial;

d. An award of damages to Plaintiffs and each Class member pursuant to GBL §349(h), including actual damages or fifty dollars, whichever is greater, with discretionary trebling up to one thousand dollars upon a finding of willful or knowing violation;

e. An award of damages to Plaintiffs and each Class member pursuant to GBL §350-e(3), including actual damages or five hundred dollars, whichever is greater, with discretionary increase up to ten thousand dollars upon a finding of willful or knowing violation, plus reasonable attorney fees;

f. Restitution and injunctive relief under Cal. Bus. & Prof. Code §§ 17200 and 17500;

g. An award of compensatory damages to Plaintiffs and the Class for all losses proximately caused by Defendants' negligent misrepresentations, in an amount to be proven at trial;

h. Restitution or disgorgement of platform fees and any creator fees actually received by Defendants through the unlawful conduct described herein, for the benefit of Plaintiffs and the Class, in amounts to be proven at trial;

i. Imposition of a constructive trust over specifically identifiable digital assets, including the publicly disclosed flywheel wallet, the token treasury, and

Defendant-controlled token allocations, to the extent traceable to the conduct alleged herein;

j.  A preliminary and permanent injunction restraining Defendants, to the extent permitted in equity, from transferring, dissipating, encumbering, or otherwise disposing of specifically identifiable, traceable assets derived from the conduct described herein, including the flywheel wallet, token treasury, platform fee wallets, and any other cryptocurrency wallets or accounts controlled by Defendants that received proceeds from the Believe platform;

k.  An award of reasonable attorney fees and costs pursuant to GBL §349(h) and as otherwise permitted by law, including costs of notice to the Class;

l.  An award of prejudgment interest to Plaintiffs and Class members at the statutory rate from the date of each wrongful act through the date of judgment; and

m.  Such other and further relief as this Court deems just, proper, and equitable.

## JURY DEMAND

172.  Plaintiffs, on behalf of themselves and all Class members, hereby demand a trial by jury on all issues so triable.

Dated: March 23, 2026
New York, New York

Respectfully submitted,

**BURWICK LAW, PLLC**
*/s/ Max Burwick*
Max Burwick, Esq.
1 World Trade Center, 84th Fl.
New York, NY 10007
(646) 762-1080
max@burwick.law

*Counsel for Plaintiffs and
the Proposed Class*

41